## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

**BRYAN HUBBARD,**

      **Plaintiff,**

**v.**                                                   **Case No.: 3:10-cv-01132**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. This case was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their supporting briefs. (Docket Nos. 12, 17 and 18).

The undersigned has fully considered the evidence and the arguments of counsel.  For the reasons that follow, the undersigned proposes and recommends that the United States District Judge find that the decision of the Commissioner is not supported by substantial evidence and should be remanded for further proceedings

pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    **Procedural History**

Plaintiff, Bryan Hubbard (hereinafter "Claimant"), applied for DIB benefits on September 6, 2006, alleging disability beginning May 15, 2006 due to "mental problems, depression, anxiety, obsessive disorder, compulsive, panic attacks." (Tr. at 110-114 and 124). The application was denied initially and upon reconsideration. (Tr. at 53 and 54). Thereafter, Claimant requested an administrative hearing, which was held on August 4, 2008 before the Honorable Michelle D. Cavadi, Administrative Law Judge (hereinafter the "ALJ"). (Tr. at 19-52). By decision dated October 22, 2008, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 7-18).

The ALJ's decision became the final decision of the Commissioner on August 23, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1-4). On September 21, 2010, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties have filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 8, 9, 12, 17 and 18).   Therefore, this matter is ripe for resolution.

## II.   **Summary of the ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability.  See *Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims.  If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied.  20 C.F.R. § 404.1520.  The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c).  If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d).  If the impairment does, then the claimant is found disabled and awarded benefits.  However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments.  *Id.* § 404.1520(e).  After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f).  If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  *Id.* § 404.1520(g); see also *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or

her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA

assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).

In this particular case, the ALJ determined, as a preliminary matter, that Claimant met the insured status requirements of the Social Security Act through December 31, 2010. (Tr. at 12, Finding No. 1).  The ALJ found that Claimant satisfied the first step of the sequential evaluation, because he had not engaged in substantial gainful activity since the alleged disability onset date; that being, May 15, 2006. (*Id.,* Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of pancreatitis, panic disorder with agoraphobia and dysthymic disorder. (*Id.*, Finding No. 3). At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment included in the Listing. (Tr. at 13, Finding No. 4). The ALJ then found that Claimant had the following residual functional capacity:

> [M]edium work as defined in 20 CFR 404.1567(c) except that he can perform no work requiring more than simple instructions and repetitive tasks; no contact with public and only occasional contact with co-workers with only routine changes in the work setting.

(*Id.*, Finding No. 5).

Therefore, Claimant could return to his past relevant employment as a buggy pusher, defined by the vocational expert as medium, unskilled work. (Tr. at 15, Finding No. 6). However, in the alternative, the ALJ asked the vocational expert to assume that Claimant could not perform his past relevant work and proceeded with the remaining steps of the sequential evaluation. (*Id.*). The ALJ considered that Claimant was 29 years old at the time of the disability onset date, which classified him as a "younger individual age 18-49," and that he had a high school education and could communicate in English. (Tr. at 16, Finding Nos. 7 and 8). The ALJ noted that

transferability of skills was not an issue, because the Medical-Vocational Rules supported a finding of "not disabled" regardless of whether Claimant had transferable job skills.  (*Id.*, Finding No. 9).  In view of these factors, the evidence of record, and the vocational expert's testimony, the ALJ concluded that Claimant could perform jobs at the medium level of exertion such as product inspector and hand packer; at the light level of exertion, including price marker, small product assembler, and product inspector; and at the sedentary level of exertion, he could work as a bench worker, all of which existed in significant numbers in the national and regional economy. (Tr. at 16-17, Finding No. 10). On this basis, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act.  (Tr. at 17, Finding No. 11).

**III.   Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is based upon the correct application of the law and is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F. 3d 650,653 (4th Cir.

2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001). The Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). As such, the Court will not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Id.* The Court's obligation is to "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch,* 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## IV.   **Claimant's Background**

Claimant was born in 1977 and was 31 years old at the time of his administrative hearing. (Tr. at 23). He earned a general education diploma ("GED") and could speak and read English and perform simple mathematics. (Tr. at 24-25 and 128). In the 15 years preceding his alleged onset of disability, Claimant was employed as a warehouse worker in 1999, a "buggy pusher" at Wal-Mart in 2001, and a construction worker/laborer for two different companies from approximately 2001 to 2006. (Tr. at 25-26). He asserts that he was "laid off" from his job on May 15, 2006, the date that he allegedly became disabled, but maintains that he had "been sick all along ... prior to that." (Tr. at 26).

## V.   **Relevant Medical Evidence**

The undersigned has reviewed the medical evidence in its entirety and will briefly summarize the relevant records below. The majority of the medical evidence of

record pertains to Claimant's mental health treatment at Prestera Centers for Mental Health Services ("Prestera") from 1997 though early 2008. However, the medical documentation also reflects that Claimant was hospitalized and treated for pancreatitis and associated left upper quadrant pain beginning in May 2007[1] and for neck pain beginning in November 2007.[2]

### A.   Pre-Onset Records

Prior to Claimant's alleged onset of disability, he received mental health treatment at Prestera beginning in 1997, at age nineteen, for complaints of anxiety, panic disorder with agoraphobia, depression, irritability, difficulty sleeping, and nausea.[3] According to the records, Claimant admitted to a long-standing history of depression, anxiety and panic attacks that originated in childhood and included thoughts of suicide. (Tr. at 421-548). Overall, however, the records establish that Claimant responded positively to treatment during the pre-onset period, at times showing significant clinical improvement.

For instance, on June 17, 2002, he reported having no functional impairments; he was working full time in construction; he was living with his fiancé and infant son; had good family support; had no psychiatric symptoms when he took his medications, although he had depression, panic, and sleep disturbance without them; and had no symptoms during the preceding three months. (Tr. at 517). On September

---

[1] Claimant reported that he suffered with pancreatitis for four years and was hospitalized prior to his November 2007 hospitalization, but those records are not included in the medical evidence of record.

[2] Similarly, it appears that Claimant was treated for neck pain prior to November 2007, but the records are not included in the file.

[3] The ALJ was provided with records from Prestera covering the time frame of mid 2005 through early 2008. After the ALJ's decision, Claimant sent the Appeals Council additional documentation, which included prior records from Prestera. These documents were made a part of the record by Order of the Appeals Council on August 23, 2010. (Tr. at 4).

9, 2002, he similarly reported that he did not suffer any impairment or symptoms due to his mental conditions. (Tr. at 518-519). On March 12, 2003, it was noted that Claimant remained stable over the past year with minimal services and the same prescriptions; thus, Claimant was to continue taking his medications as prescribed. (Tr. at 532-533). On January 8, 2004, Claimant reported experiencing panic attacks for the first time in several years. (Tr. at 427-429). However, on March 11, 2004, his symptoms were stable and on April 2, 2004, his anxiety and panic attacks had decreased and he was working full time. (Tr. at 432 and 430). On June 4, 2004, Claimant complained of mild anxiety due to "work, kids, etc.," but no impairment was noted.  Claimant was employed full time as a bricklayer and was active socially. (Tr. at 435). His symptoms remained stable as reported in his visits on November 8, 2004; January 31, 2005; April 18, 2005; and October 24, 2005. (Tr. at 437, 446, 450, and 205). On April 24, 2006, shortly before his alleged onset of disability, Claimant reported to Rita Morris, M.A.,  a counselor at Prestera,  that he had some anxiety and decreased sleep and concentration; that he was recently laid off, but expected to be contacted to work soon; and he admitted taking more Klonopin on some days than what was prescribed, but was not interested in other treatment services. (Tr. at 188). On the same date, Claimant's psychiatrist at Prestera, Dr. Kambiz Soleymani, M.D., noted that Claimant was laid off two weeks prior; however, Claimant was doing well regarding his depression and anxiety, had no panic attacks or insomnia, no change in appetite or weight, and denied history of or current drug abuse. (Tr. at 204).

**B.    Records Prepared During Relevant Time Period**

On July 5, 2006, Claimant contacted Prestera and reported having more frequent panic attacks.  He asked to see a psychiatrist that day and wanted an

9

increase in Klonopin, the medication prescribed to treat his panic attacks. The psychiatrist on duty was unable to see him and refused to increase the dosage of medication until Claimant could be seen. Claimant was offered the services of the crisis residential unit ("CRU") and therapy, but he stated that he was not interested and would wait for an appointment. (Tr. at 187).

On July 25, 2006, Claimant reported feeling even more distressed, anxious, and sad since his wife and children left him one month prior. (Tr. at 183). He was not working as he was laid off in May 2006. (*Id.*). He reported having panic attacks, shortness of breath, palpitations, vomiting, sweating, and increased behaviors associated with obsessive compulsive disorder (hereinafter "OCD"); such as, repetitive counting and "repeating things in [his] mind." (*Id.*). His prognosis was "fair-guarded." (Tr. at 184). His primary diagnosis was panic disorder with agoraphobia and his global assessment of functioning (hereinafter "GAF") score was 60.[4] (Tr. at 235).

On August 22, 2006, Claimant stated that he was "not doing better;" he reported that he continued to have depression and anxiety which had not improved even with dosage increases of Prozac and Klonopin. (Tr. at 207). He reported crying spells, anxiety attacks, and increased OCD behaviors. (*Id.*). His unemployment and marriage issues were noted as stressors. (*Id.*).

---

[4] The GAF scale is a tool for rating a person's overall psychological functioning on a scale of 0-100. This rating tool is regularly used by mental health professionals and is recognized by the American Psychiatric Association in its *Diagnostic and Statistical Manual of Mental Disorders (DSM) IV.* A GAF of 60, which falls in the range of 51-60, indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). This score reflected a significant change from Claimant's prior level of functioning, which garnered a GAF score of 100 in November 2004. (Tr. at 439). A GAF score of 100 indicates superior functioning with no psychiatric symptoms.

On September 5, 2006, Claimant stated that he felt that he could no longer work and planned on applying for disability. (Tr. at 202). He believed his symptoms were worsening. (*Id.*). He was not interested in CRU services or going to St. Mary's Hospital for a mental health evaluation. (*Id.*). The following day, Claimant was seen on an emergency basis. He reported symptoms of suicidal ideation without intent or plan, poor concentration, depression, anxiety, hopelessness, panic, low energy, decreased appetite and decreased interest. (Tr. at 196). He again refused CRU services and therapy. (*Id.*). His GAF score was 55. Claimant was instructed to continue taking his medication to maintain treatment of his panic disorder and dysthymia. (*Id.*).

On October 29, 2006, Claimant reported that he was "not too good." He admitted to having a panic attack that morning when he ran out of medication. (Tr. at 267). He said that Niravam helped with his anxiety, but he still had panic attacks, insomnia, nightmares, crying spells, and poor energy level. (*Id.*). Claimant's father, who attended the session, described Claimant as displaying some odd behaviors, such as appearing in public in his "shorts." (*Id.*). Dr. Soleymani adjusted Claimant's medications.

On November 13, 2006, Claimant returned to Dr. Soleymani's office for follow-up, once again accompanied by his father. (Tr. at 268). Claimant complained of frequent panic attacks and stated that "he talks to himself alot." He denied suicidal thoughts, and his father confirmed that Claimant had not engaged in any more odd behavior. (*Id.*). Dr. Soleymani diagnosed Claimant with major depressive disorder with psychotic features. He adjusted Claimant's medications and obtained an agreement from Claimant's father that he would help monitor his son's compliance

with the medication regimen.  Dr. Soleymani assessed Claimant's GAF score as 50.[5]

On December 13, 2006, Claimant was "a little bit better" and having less panic attacks, but did not go out and was staying at home. (Tr. at 269). He had poor concentration and memory, reported losing things, and continued to have problems with anxiety. (Id.). He denied recent odd behavior. (*Id.*).  Claimant reported that he had been denied Social Security benefits.

In a letter dated December 19, 2006, Claimant's treating psychiatrist, Dr. Soleymani, advised that Claimant was in treatment at Prestera Center for medication management for major depression, recurrent, with psychotic features, and panic disorder with agoraphobia. (Tr. at 270). Dr. Soleymani opined that Claimant's symptoms would last for at least 12 months and that "it was not expected that he will be able to work during this time." (*Id.*).

On January 18, 2007, Claimant reported severe symptoms of withdrawal, impulsivity, paranoia, depression, guilt, hopelessness, helplessness, and loss of interest in activity. (Tr. at 303). He lived alone and could perform most activities of daily living such as cleaning and bathing; however, his parents lived nearby and his mother cooked his meals so that he would remember to eat. (*Id.*).  His GAF score was 55. (Tr. at 316).

On February 7, 2007, Claimant stated, "I don't have panic attacks." (Tr. at 317).  However, he reported having two to three panic attacks since his last visit. (*Id.).* His ability to sleep was fine and did not have a poor energy level. (*Id.*). He had occasional crying spells with no auditory or visual hallucinations; he felt that people

---

[5] A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideations, severe obsessional rituals, frequent shoplifting) OR any serious difficulty in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

made fun of him and did not "go out." (*Id.*). He had no recent odd behavior, but had poor concentration and focus, as well as OCD behaviors of repetitive hand washing, taking showers twice per day, changing his clothes frequently, and counting numbers. (*Id.*).

On May 4, 2007, Claimant was assessed with chronic pancreatitis. (Tr. at 602).[6] He later complained of pain in his left upper quadrant. (Tr. at 290)

On May 9, 2007, Claimant reported depression and OCD, stating, "but I have good days and bad days." (Tr. at 333). He mostly stayed at home and watched television. (*Id.*). His prognosis was guarded. (Tr. at 334). He had a poor response to medication and refused psychotherapy; he had not and did not intend to change his lifestyle in order to improve his mood. (*Id.*).  Later that month, on May 31, 2007, Claimant reported severe symptoms of withdrawal, impulsivity, poor concentration, depression, guilt, loss of interest in activities; moderate symptoms of hostility, poor judgment, anxiety, agitation, low energy, and distractibility; mild symptoms of hopelessness, helplessness, and phobic. (Tr. at 348).

On June 11, 2007, Claimant advised Dr. Soleymani that he had recently been in the hospital for six days for pancreatitis and that it was his fifth hospitalization for that medical condition. (Tr. at 330). Claimant complained that he was "staying physically sick."  He stated that his OCD symptoms were getting worse, including increased hand washing and singing tunes over and over in his head. (*Id.*). However, he denied paranoia or sleep problems and demonstrated better eye contact with was less nervousness than in prior visits. (*Id.*).  Dr. Soleymani diagnosed Claimant with

---

[6] As previously noted, it appears that Claimant was hospitalized for pancreatitis prior to this time, but the records are not included in the file.

major depressive disorder with psychotic features and assessed his level of functioning, assigning a GAF score of 55.

On July 19, 2007, Claimant was referred to Tyler Stevens, M.D., at the Cleveland Clinic, for an endoscopic ultrasound, which revealed mild parenchymal features of chronic pancreatitis.[7] (*See* Tr. at 292).  A secretin direct pancreatic function test revealed mild impairment of exocrine function consistent with early chronic pancreatitis as well. (*Id.*). Dr. Stevens stated that although Claimant did not have severe exocrine insufficiency manifest by steatorrhea, a trial of pancreatic enzymes may be reasonable to see if it could assist in pain management. (*Id.*).

On July 31, 2007, Claimant reported that he was "in pain all the time." (Tr. at 350). He complained of pain, nausea, diarrhea, but stated that mentally, he was much better and wanted to go back to work. (*Id.*). He had a scheduled court date regarding child custody and child support and had a girlfriend. (*Id.*).  He expressed wanting to be a "role model for his children." Claimant admitted to having occasional panic attacks, but did not want to change his medication. (*Id.*). He presented with a different attitude; he was more optimistic, wanted to return to work, did not have restless legs, maintained better eye contact, came unaccompanied to the office, and was talkative. (*Id.*).

However, on October 23, 2007, Claimant reported severe depression as evidenced by severe anxiety and guilt. (Tr. at 366). He had panic attacks once or twice per week and moderate suicidal ideation without a plan. (*Id.*). He said that what "keeps him going" were his two sons. (*Id.*).  He was upset with the courts, his ex-wife

---

[7] Chronic pancreatitis is an inflammation of the pancreas that does not heal or improve, gets progressively worse, and leads to permanent damage.  The symptoms include abdominal pain and digestive difficulties.  *www.nlm.nih.gov*

and the children's uncle. (*Id*.).  His GAF score was 50. (Tr. at 364).

On November 27, 28 and 30, 2007, Claimant was seen at Lavalette Chiropractic. (Tr. at 353). He received a cervical and thoracic adjustment. (*Id*.).  The following day, he acknowledged that he felt better after treatment, although his fingers were still numb and he had less than normal range of motion in his cervical and thoracic areas. (*Id*.). He continued to improve with further adjustments and had less spasms and numbness overall. (*Id*.).

On February 12, 2008, Claimant was seen at St. Mary's Clinic for a routine follow up office visit and continued to complain of abdominal pain.  (Tr. at 637). He refused a celiac plexus block or spinal cord stimulator trial. (*Id*.).  Fentanyl did not alleviate his pain. (*Id*.). He took Lortab three times per day, but stated that it would provide relief for two hours at the most and then the pain would return significantly. (*Id*.). The following month, it was noted that Claimant wanted to increase the overall amount of his narcotics, but his physician was unwilling to do so, as Claimant was currently taking Percocet 7/5/500 milligrams three times per day. (Tr. at 392). Claimant reported that he was still in the process of seeking disability benefits. (*Id*.).

On February 23, 2008, Claimant underwent a comprehensive psychiatric evaluation performed by Dr. Soleymani. (Tr. at 370-372).  Claimant reported mild problems with anxiety and depression, but "not as bad as before." He indicated that his pain was getting worse, and his medication was changing from Lortab to Percocet. Dr. Soleymani conducted a mental status examination that was essentially normal. Dr. Soleymani diagnosed Claimant with severe major depressive disorder with psychotic features, in partial remission; generalized anxiety disorder; OCD; and rule out personality disorder. (*Id*.). His GAF was 60. (*Id*.). His prognosis was fair with

treatment. (*Id.*).

On September 4, 2008, Claimant continued to complain of abdominal pain. (Tr. at 619). He said that his medication did not help his pain and he was "getting fed up" and wanted to try celiac platelets blocker on the first of the year as he wanted to wait until after hunting season. (*Id.*).

## C.   Records Submitted to the Appeals Council

As previously noted, in January 2010, Claimant supplied the Appeals Council with additional medical records, including the Prestera records reflecting psychiatric care that pre-dated the alleged onset of disability and records that post-dated the administrative hearing, which documented care received by Claimant for chronic pancreatitis and musculoskeletal pain. (*See* Tr. at 420). In particular, on January 2, 2009, Claimant finally received the celiac plexus block that had been previously recommended. (Tr. at 586). The procedure was completed without complication. However, on April 23, 2009, Claimant presented to the St. Mary's Pain Relief Center complaining of continuing abdominal pain. (Tr. at 565). His medication had been changed from Percocet to Opana ER on a previous visit, and now he stated that the Opana ER had only worked well for the first month.  Claimant requested to be switched back to Percocet. (*Id.*). On July 23, 2009, Claimant reported that the Percocet helped alleviate his abdominal pain, but added that he fell two months prior and hurt his right knee which caused him additional pain that he rated a "2" out of "10." (Tr. at 559).  He also complained of neck pain.  Claimant subsequently received an injection in his right knee to alleviate the pain from his fall and underwent surgery in August 2009 to relief his neck symptoms. (Tr. at 556).

On September 9, 2009, Claimant complained of abdominal, neck, and middle upper back pain during his routine evaluation at the St. Mary's Pain Relief Center. (*Id.*).  He reported that he was quite miserable from his neck surgery.  He claimed that he did not fill the prescription for pain medication that he received after neck surgery and needed additional pain medication. However, when the attending physician checked a Board of Pharmacy report, he learned that Claimant had actually filled the prescription at a different pharmacy than he used for prescriptions written by Pain Relief Center. (Tr. at 557). Claimant denied doing so, but in view of his history of inappropriate pill counts, the Center would not issue any extra pain medication. (*Id.*).

### D.   <u>State Agency Assessments</u>

On November 3, 2006, Joseph Kuzniar, Ed.D., a non-examining consultant, completed a Psychiatric Review Technique at the request of Disability Determination Services ("DDS"). (Tr. at 253-266). He found that Claimant suffered from dysthymic disorder and panic disorder with agoraphobia which rendered him mildly restricted in activities of daily living and maintaining concentration, persistence, or pace and moderately limited in maintaining social functioning. (Tr. at 256, 258, and 263). Dr. Kuzniar questioned Claimant's credibility, indicating that Claimant's treatment notes revealed mostly normal mental status examinations, yet he complained of worsening symptoms.  Dr. Kuzniar opined that an examination of the medical evidence would be necessary to determine if it was consistent with Claimant's reported activities of daily living. (Tr. at 265). He added that he found Claimant to be only partially credible as to his statements of decreased memory, difficulty with CPP skills, inability to be around people, and difficulty with carrying out instructions, because these statements

were not fully supported by the objective medical evidence of record. (*Id.*).

On the same date, Dr. Kuzniar completed a Mental Residual Functional Capacity Assessment (hereinafter "MRFC" assessment). (Tr. at 249-252). On a scale of "not significantly limited," "moderately limited," "markedly limited," "no evidence of limitation," and "not rateable on available evidence," Dr. Kuzniar found the following:

- There was no evidence that Claimant was limited in his ability to ask simple questions or request assistance or to be aware of normal hazards and take appropriate precautions.

- Claimant was "not significantly limited" in his ability to remember locations and work-like procedures; to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods of time; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to travel in unfamiliar places and use public transportation; and to set realistic goals and make plans independently of others.

- Claimant was "moderately limited" in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

(Tr. at 249-250). Dr. Kuzniar noted that Claimant's MRFC ratings substantiated his ability to understand, remember, and carry out at least 1-3 step routine instructions within a very low to low social interaction demand work setting. (Tr. at 251). Claimant's capacity for adaptation was evaluated to be somewhat decreased. (*Id.*).

On January 29, 2007, John Todd, Ph.D., a licensed psychologist and non-examining agency consultant, completed a second Psychiatric Review Technique. (Tr.

at 272-285). Dr. Todd found that Claimant suffered from major depressive disorder, recurrent, severe, with psychotic features and panic disorder with agoraphobia which rendered him mildly restricted in activities of daily living and maintaining concentration, persistence, or pace and moderately limited in maintaining social functioning. (Tr. at 275, 277 and 282). Dr. Todd deemed Claimant only partially credible due to the fact that his treatment notes stated that Claimant's mental status was within normal limits, which was inconsistent with Claimant's statements that his symptoms were worsening. (Tr. at 284). Dr. Todd noted that Claimant received medication for psychiatric diagnoses; his activities of daily living were performed independently; he could drive and manage his finances, although he was moderately deficient in social functioning. (*Id.*).

Dr. Todd then completed a MRFC assessment. (Tr. at 286-289). He concluded the following:

- Claimant was "not significantly limited" in his ability to remember locations and work-like procedures; to understand, remember, and carry out very short and simple instructions; to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of time; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places and use public transportation; and to set realistic goals and make plans independently of others.

- Claimant was "moderately limited" in his ability to work in coordination with or proximity to others without being distracted by them; to interact

appropriately with the general public; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting.

(Tr. at 286-287). He noted that Claimant's functional capacity limitations did not exceed moderate and did not call for "an RFC allowance." (Tr. at 288). Claimant had the capacity for routine, repetitive activities with limited contact with coworkers and the general public. (*Id.*). Otherwise, he was able to learn and perform simple, unskilled work activities with limited changes. (*Id.*).

## VI.   <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant challenges the decision of the Commissioner on four grounds, contending that the ALJ (1) simply ignored the opinion of Claimant's treating psychiatrist who concluded that Claimant was totally disabled, (2) ignored "reams of important relevant evidence" and was "selective in the extreme with respect to the evidence she does rely upon;" (3) did not properly consider Claimant's credibility; additionally, (4) that the Commissioner failed to remand the case to the ALJ based on new and material evidence. (Pl.'s Br. at 19-31).

In response, the Commissioner asserts that substantial evidence supports the ALJ's finding that Claimant was capable of performing his past relevant work and other work; that he failed to meet his burden of demonstrating that he was disabled; that the ALJ properly evaluated Claimant's credibility; and the additional evidence submitted to the Appeals Council does not warrant remand. (Def.'s Br. at 24- 34).

## VII.   <u>Analysis</u>

After a careful review of the record, the undersigned finds that the ALJ failed to comply with the applicable Social Security regulations and rulings, and, as a result, the court is unable to conclude that the Commissioner's decision is supported by

substantial evidence.  First, the decision is deficient in that it contains no analysis of the medical evidence and lacks explanation for the weight implicitly given to competing medical opinions.  Second, the decision is void of discussion at step three of the sequential evaluation, leaving the undersigned to speculate as to which listed impairments were considered and rejected by the ALJ.  Because this decision became the final decision of the Commissioner, the undersigned respectfully recommends that the presiding District Judge find the decision of the Commissioner is not supported by substantial evidence and must be remanded for further analysis pursuant to sentence four of 42 U.S.C. § 405(g).

### A.   <u>Opinion Evidence</u>

Claimant argues that the ALJ simply ignored the December 19, 2006 opinion of Dr. Soleymani that Claimant's symptoms of major depression, recurrent with psychotic features, and panic disorder with agoraphobia were expected to last for at least 12 months and would prevent him from working. As a result, Claimant contends that the Commissioner's decision fails to conform to the applicable Social Security regulations and rulings. (Pl.'s Br. at 19-20). The undersigned agrees that the ALJ's decision lacks sufficient scrutiny and explanation of the medical evidence, as a whole, to support the findings contained therein. In particular, the ALJ's superficial review of the medical opinions of evidence, combined with her failure to weigh those opinions and resolve inconsistencies, effectively prevent the Court from assessing the evidentiary basis of the Commissioner's final decision.

20 C.F.R. § 404.1527 outlines how opinion evidence will be considered and weighed in determining whether a claimant qualifies for disability benefits. The regulation provides that disability must be based on a physical or mental impairment,

which results from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id* § 404.1527(a).   In deciding whether the foundation for a claim of disability exists, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [she] receives." *Id* § 404.1527(b).   Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions." *Id* § 404.1527(a)(2).   If after reviewing all of the evidence, the medical opinions are consistent with each other and with the other information in the record and the evidence is sufficient to support a determination, the ALJ will make a decision regarding disability based on the available evidence.   If the medical opinions are inconsistent, either internally or with other opinions or evidence in the record, the ALJ will weigh the evidence, including the medical opinions, to determine whether a decision can be made on the Claimant's alleged disability using only the information in the record. If not, the ALJ takes additional steps to resolve the inconsistencies or supplement the evidence, including, for example, requesting additional records, recontacting treating sources, or asking the claimant to undergo a consultative examination.   *Id* § 404.1527(c). Throughout this process, the ALJ is required to evaluate and, if necessary, weigh every medical opinion of record, regardless of the opinion's source.   In weighing opinions, the ALJ is expected to use a hierarchical system. In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source.   *See* 20

C.F.R. § 404.1527(d)(1).  Even greater weight is allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  *See* 20 C.F.R. § 404.1527(d)(2).  Nonetheless, the opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits, *Id.* § 404.1527(d)(2), and is only afforded "controlling weight" if two conditions are met: "(1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence."  *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. § 404.1527(d)(2).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all the medical opinions of record, taking into account the factors listed in *Id.* § 404.1527(d)(2)-(6), which are (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p.  Ultimately, it is the responsibility of the Commissioner, not the court, to evaluate the case, make findings of fact, and resolve conflicts of evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  The regulation states, however, that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  *Id.* § 404.1527(d)(2).

In the event that a treating source's opinion is not given controlling weight, and the opinions of non-examining experts are considered, the ALJ should weigh

those opinions using the rules contained in 20 C.F.R. § 404.1527 (a)-(e).  If the non-examining sources are agency experts, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources." 20 C.F.R. § 404.1527(f).

Similarly, in determining an individual's RFC, the ALJ "must always consider and address medical source opinions and "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p at 6. If conflicting medical evidence or opinions are present in the record, the ALJ must resolve the conflict, *Diaz v. Chater,* 55 F.3d 300 (7th Cir. 1995), by weighing the medical source statements, again "providing appropriate explanations for accepting or rejecting such opinions." 20 C.F.R. § 404.1527. "[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater,* 79 F.3d 1007, 1009 (10th Cir. 1996), citing *Vincent ex rel. Vincent v. Heckler,* 739 F.2d.1393 (9th Cir. 1984). "A minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984).

Medical source opinions on issues reserved to the Commissioner are treated differently than other medical source opinions.  20 C.F.R. § 404.1527(e).  In both the regulation and Social Security Ruling 96-5p, the SSA addresses how medical source opinions are considered when they encroach upon these "reserved" issues; for

example, opinions on "whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (the listings); what an individual's residual functional capacity (RFC) is. . . . and whether an individual is 'disabled' under the Social Security Act. . ." Opinions concerning issues reserved for the Commissioner are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled."  SSR 96-5p at 2. However, these opinions must always be carefully considered and "must never be ignored." *Id.*  Put simply, the Social Security regulations and rulings unequivocally require an ALJ to consider and weigh each medical opinion, resolve any inconsistencies between them, and explain the impact of each opinion on the ALJ's ultimate determinations.

Nevertheless, when reviewing the decision of an ALJ, the court does not search for procedural perfection. If the decision is supported by substantial evidence and contains an adequate explanation of the information in the record, the reviewing court may affirm a less than perfect decision, as long as any errors are harmless.  *See, e.g. Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)("Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected."). Accordingly, procedural improprieties will only constitute a basis for remand if such improprieties cast into doubt the existence of substantial evidence to support the ALJ's decision.  *See, also,*

*Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").[8]

With these considerations in mind, the undersigned reviewed the ALJ's decision. Here, the ALJ's decision is so lacking in any substantive discussion of the objective medical evidence and medical opinions that it casts into doubt the existence of a substantial evidentiary basis.  The ALJ not only omitted even the slightest reference to Dr. Soleymani's December 2006 opinion—despite it being an opinion given by the sole treating psychiatrist in the case—but the ALJ failed to expressly analyze or weigh ***any*** of the medical opinions in the record. This error is particularly troubling when viewing the evidence of record, which is predominated by mental health evaluations, treatment notes, and opinions generated by Dr. Soleymani and the counselors and therapists at Prestera.[9]  Despite the abundance of documentation, the ALJ's decision relies almost exclusively on the testimony and statements of Claimant, which are included in detail in the decision.  However, for the most part, the decision refers to the medical evidence only in a conclusory fashion, oddly lacking any meaningful discussion of the specific objective medical findings and opinions; particularly, those upon which the ALJ relied in crafting her RFC finding. Instead, she simply states that she "considered opinion evidence in accordance with the

---

[8] The United States Court of Appeals for the Fourth Circuit, in a number of unpublished decisions, has taken the same approach.  *See, e.g., Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

[9] The record indicates that Claimant was treated at Prestera Center for a minimum of 11 years, beginning in 1997.  As previously noted, some of these records pre-date the alleged onset of disability and were supplied after the ALJ's decision; however, that does not explain the absence of any significant discussion in the opinion regarding the records that were available to the ALJ, including the opinion by Dr. Soleymani that Claimant was unable to work for a period to last at least 12 months.

requirements of 20 C.F.R. 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. at 14, Finding No. 5).

The deficiencies contained in the ALJ's decision cannot be viewed as harmless in light of the fact that the ALJ implicitly rejected the opinions of Claimant's treating psychiatrist and therapists[10] and apparently adopted or assigned more weight to the opinions of non-examining agency experts when assessing Claimant's RFC.[11] Without any explicit reasoning or support for the ALJ's RFC findings, the undersigned is unable to determine the sufficiency of the ALJ's decision that Claimant is able to perform the jobs identified by the vocational expert.

The undersigned acknowledges that the records from Prestera suggest considerable waxing and waning of Claimant's mental health symptoms after the alleged onset of disability, including periods highlighted by minimal symptoms and adequate functioning.  Moreover, the opinion of Dr. Soleymani that Claimant was unable to work is not entitled to controlling weight and may even be considered contradictory of or unsupported by his own treatment notes. Had the ALJ discussed these considerations, she may well have rejected Dr. Soleymani's opinion for one or

---

[10] Although not an "acceptable medical source," the ALJ should still consider a therapist's opinion as an "other source," 20 CFR 404.1513(d), and apply the factors listed in 20 CFR 404.1527(d). Information from "other sources" can be valuable in evaluating a Claimant's application for disability because it "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p.

[11] Although the ALJ does not state that she adopted the opinions of the agency experts, one can extrapolate that she relied heavily on their findings in lieu of Claimant's treating psychiatrist. The ALJ found that Claimant had the MRFC to perform work requiring no more than simple instructions and repetitive tasks, no contact with the public, only occasional contact with co-workers, and only routine changes in the work setting.  (Tr. at 13). With the exception of the limitation of no contact with the public, this MRFC determination reflects Dr. Kuzniar's opinion that Claimant could understand, remember, and carry out at least 1-3 step routine instructions within a very low to low social interaction work setting. (Tr. at 251) and Dr. Todd's findings that Claimant could perform routine, repetitive activities with limited contact with coworkers and the general public, but could otherwise learn and perform simple, unskilled work activities with limited changes (Tr. at 288).

more of the reasons suggested by the Commissioner.   Indeed, Dr. Soleymani's opinion was vastly different from those expressed by the agency consultants.   As such, the ALJ should have evaluated the conflicting opinions and explained the weight, if any, she assigned to them. As previously stated, the Social Security regulations and rulings clearly require adjudicators to "always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner" and that in the case of "treating sources, the rules also require that [the ALJ] make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear." SSR 96-5p. The "opinions from any medical source on issues reserved to the Commissioner must never be ignored." *Id.* Rather, "[t]he adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner" and "[i]f the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." *Id.* "In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 CFR 404.1527(d)," such as "the supportability of the opinion and its consistency with the record as a whole." *Id.* The "notice of the determination or decision must explain the consideration given to the treating source's opinion(s). *Id.*   Weighing the evidence and resolving conflicting opinions simply are not within the purview of the Court. Similarly, this Court will not supply a rationale for rejecting an opinion where the ALJ has supplied none. *Cf.*

*Patterson v. Bowen,* 839 F.2d 221, 225 n. 1 (4th Cir. 1988) ("We must ... affirm the ALJ's decision only upon the reasons he gave."). By failing to analyze the medical evidence and adequately explain the weight that was given to obviously probative opinions, the ALJ has made it impossible for the Court to determine whether her decision was (1) reached after careful consideration of the totality of the evidence and (2) supported by substantial evidence.

### B.   The Listing

Although Claimant does not specifically challenge the ALJ's conclusions at the third step of the sequential evaluation, the undersigned finds that the ALJ's decision at that step is also deficient. The ALJ noted only that Claimant did not have an impairment or combination of impairments that met or medically equaled a listed impairment.[12]   In the absence of explanation, the undersigned is left to wonder whether the ALJ failed to conduct the requisite comparison of Claimant's impairments to the most similar listed impairments or simply failed to articulate the results of that comparison. In either case, the ALJ failed to fulfill her responsibility. (Tr. at 13, Finding No. 4). In *Cook v. Heckler,* 783 F.2d 1168, 1173 (4th Cir. 1986), the Fourth Circuit held that an ALJ must identify the relevant listed impairments and compare each of the listed criteria to the evidence of the claimant's symptoms. "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." *Id.* The ALJ discharges her duty when she provides findings and determinations sufficiently articulated to permit meaningful judiciary review. *DeLoatche v. Heckler,* 715 F.2d 148, 150 (4th Cir. 1983).

---

[12] At the second step of the process, the ALJ stated that she was not "persuaded that the claimant's mental impairments qualify for presumptive disability," but she fails to identify which listed impairments she considered in reaching this conclusion.  (Tr. at 12).

Here, the ALJ concluded that Claimant suffered from severe pancreatitis, panic disorder with agoraphobia and dysthymic disorder, yet failed to expressly analyze any of the associated Listings. For instance, the ALJ did not discuss Listing 12.04 which concerns affective disorders which are characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome, nor did she discuss Listing 12.06 which relates to anxiety-related disorders. The ALJ's conclusory statement that Claimant did not meet any of the Listings is not adequate to articulate to the Court the Listings she considered and how she determined that Claimant's impairments did not meet or medically equal them. Therefore, the undersigned recommends that the ALJ also address this issue on remand.

Based on all of the above, the undersigned respectfully proposes that the District Judge **FIND** (1) that the ALJ failed to properly consider and weigh the opinion evidence or analyze the applicable Listings, and (2) that this failure mandates a further finding that the final decision of the Commissioner was not supported by substantial evidence. Finally, the undersigned proposes that the Court **FIND** that this matter should be remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## VIII.      <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** plaintiff's Motion for Judgment on the Pleadings (Docket No. 12), **DENY** defendant's Motion for Judgment on the Pleadings (Docket No. 17), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. §

405(g) for further administrative proceedings, and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Faber and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 29, 2011.

Cheryl A. Eifert
United States Magistrate Judge

31